MOORE, J.,
for the Court:
¶ 1. Appellant Bryan Wheat was indicted for felonious child abuse in Walthall County. His motion for change of venue was granted and after a two day trial held in the Lincoln County Circuit Court, the jury found Wheat guilty. Wheat was sentenced to twenty years into the custody of the Mississippi Department of Corrections and ordered to pay a $10,000 fine. Aggrieved, Wheat cites one issue on appeal:
WHETHER THE VERDICT OF THE JURY IS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
Finding no error, we affirm.
I. FACTS
¶ 2. In August 1997, appellant Bryan Wheat met Melanie Baker at a Wal Mart in Louisiana where they were both employed. At the time, Melanie was living with her husband, her stepson, and her toddler Glenn. While Melanie’s husband abused her on a regular basis, he apparently never physically abused the children. About mid-December 1997, Melanie and Wheat began dating, and around Christmas of the same year they decided to move in together. On Christmas Day they moved in with Melanie’s father and stepmother in Tylertown, Mississippi. A couple of months later they moved next door into a trailer which belonged to Melanie’s aunt. Melanie did not divorce her abusive husband.
¶ 3. Melanie procured employment at Fred’s Dollar Store where she worked during the day. Wheat worked the night shift at a company named Multi-Craft. Melanie and Wheat hired Shannon Wallace *1074 to periodically babysit so Wheat- could sleep undisturbed during the day after working all night. Melanie thereafter, arranged for Glenn to attend daycare at Precious Angels. Glenn’s first' day at Precious Angels was on April 28.
¶ 4. Shortly after Melanie, Wheat,' and Glenn moved into the trailer, Glenn developed bruising on his face which looked like fingerprints. This bruising occurred while Melanie was at the video store and Glenn was under Wheat’s sole care. Melanie testified that she telephoned Wheat from the video store because they did not have the video he wanted. She testified that Wheat was in “hysterics” because Glenn had fallen and hit his head on the bed, and Wheat told her to come home right away. At trial Wheat denied that Melanie was at the video store when the fingerprint bruising occurred; however, Anita Loflin, Wheat’s and Melanie’s friend, testified that Wheat told her that Glenn fell and hit his face on the bed while Melanie was at the video store.
¶ 5. The next suspicious bruising occurred shortly before Glenn’s first day at Precious Angels. Glenn was under Wheat’s care, and Melanie was at work. Jerry Womack, Loflin’s fifteen-year-old son, was helping Wheat mow his lawn. Womack testified that when they arrived at the trailer, Wheat spanked Glenn and put him on the toilet. Glenn, who was undergoing toilet training at the time, had soiled himself. Jerry testified that after he mowed one round, he saw that Glenn had a knot on his head. Womack did not see what caused the injury, but Wheat was alone with Glenn at the time. After the blow to the head, Glenn’s eyes began turning black. Wheat called Melanie at work to ask whether he should seek medical attention. Melanie left this decision to Wheat’s discretion. Wheat did not take Glenn to the doctor. Wheat told several witnesses that Glenn’s injury was either caused by a bee or wasp sting, or by a plastic bat or rubber ball with which Glenn had been playing at the time. This is the story that both Wheat and Melanie gave Susan Alford, the owner of Precious Angels.
¶ 6. Shannon Wallace, the babysitter, testified that he never witnessed any abuse to the baby, but he heard violence being inflicted upon him by Wheat. Specifically, Wallace recalled a time when he was in another room when he heard Wheat hit Glenn and throw him on the bed. Wallace saw the fingerprint bruises on Glenn’s face and also described bruises on Glenn’s back that looked like a hand print. Wallace did not report his suspicions of abuse because he did not want “to get himself into h situation.”
¶ 7. Loflin’s daughter, nine-year-old Amanda Fuller, visited with Wheat and Glenn one day when Wheat was in the bathroom bathing Glenn. Fuller, who was in the living room at the time, heard two slaps and then heard Glenn cry. Wheat was laughing when he exited the bathroom. At trial Wheat explained that he had slapped his hands together. He denied slapping Glenn.
¶ 8. Harold Beckner, Melanie’s father, testified that at times Wheat would get into a “wired” state when he seemed extremely nervous. He observed one occasion when Wheat was quivering and shaking after correcting the baby. Beckner’s wife, Joanna Beckner, described an episode which occurred during the period before Wheat, Melanie, and Glenn moved into the trailer. Joanna testified that one night Melanie woke her up to help with Wheat who was crying and rocking in the bed. After this episode, Wheat had his prescription for “nerve pills” refilled. Wheat admitted that he had been taking Xanex for his nerves. There was also some testimony that Melanie was on “nerve pills.” Before Melanie and Wheat got together, Melanie would sometimes stay with Harold and Joanna for a few months at a time to escape her abusive husband. During these periods, neither Harold nor Joanna noticed any strange bruises on Glenn. Joanna testified that *1075 Melanie was not very stern with Glenn. Harold and Joanna moved away from Ty-lertown about two weeks before Glenn sustained the injury that resulted in the two black eyes. Neither had suspected child abuse at the time they moved.
¶ 9. On May 1, 1998, Melanie dropped Glenn off at Precious Angels. Susan Alford, the owner of Precious Angels, testified that Glenn was fine that morning and had a good appetite. Alford testified that Wheat picked Glenn up at about 4:00 or 4:30 p.m. and that Glenn was fine but seemed reluctant to go with Wheat. Wheat told both Melanie and Sheriff Duane Dillon that he picked Glenn up at around 5:30 p. m. After leaving Precious Angels, Wheat testified that he and Glenn visited Loflin at her home for about one to one and one-half hours. Loflin testified that Wheat visited her before he picked Glenn up and that Wheat did not come by with Glenn afterwards. Wheat also testified that he asked Shannon Wallace to babysit that day so he could help out at T.C.’s Body Shop. Wallace testified that he did not see or talk to Wheat that day.
¶ 10. Wheat and Glenn picked Melanie up from work at about 7:15 p.m. Melanie noted that Glenn was not in his car seat and that he seemed listless. When she asked Wheat why Glenn was behaving so strangely, Wheat explained that he had gotten onto Glenn for soiling himself. Wheat left for work at around 9:00 p.m. Glenn was fussy during the night. The next morning, Melanie noticed that Glenn’s skin was a yellowish color and that he felt warm. She also noticed that Glenn would turn his head one way but not the other. Glenn resisted Melanie’s efforts to turn his head the other way. Glenn complained “neck, mommy, neck, neck.” Glenn’s repeated complaints about his neck prompted Melanie to take Glenn to the hospital at around 11:00 a.m.
1111. Lurline Roberts, an emergency room nurse at the Walthall County General Hospital, immediately contacted Dr. David Compton upon observing Glenn’s “racoon eyes.” Dr. Compton observed that Glenn’s bowel wall was rigid and diagnosed an acute surgical abdomen which was most likely caused by blunt injury abdominal trauma. Dr. Compton also noted the “racoon eyes” were most likely two to three days old. He saw bruises on Glenn’s back and recent bruising on Glenn’s penis. While at the emergency room Glenn vomited “coffee grounds,” which Nurse Roberts explained was old blood. Glenn was so sick that Dr. Compton arranged for Glenn to be transported by helicopter to the University Medical Center (U.M.C.) hospital in Jackson. Dr. Compton testified that the blow to Glenn’s abdomen occurred less than twenty-four hours before his presentation in the emergency room but more than four hours before, with the most likely time period being about twelve to sixteen hours before his emergency room visit. Dr. Compton was one hundred percent sure that Glenn’s injuries were not self-inflicted or accidental and that Glenn was a victim of physical abuse.
¶ 12. Dr. William Sorey, a professor of pediatrics at U.M.C. and a pediatric emergency room physician, treated Glenn upon his arrival. Glenn was in shock due to an internal hemorrhage. When an NG tube was passed down through Glenn’s nose, fresh blood came out of his stomach. Dr. Sorey discovered that Glenn had suffered a ruptured duodenum, a segment of the small bowel. The rupture caused the contents of Glenn’s small bowel to spill into his belly cavity, and Glenn developed peritonitis, an infection to his belly. Glenn was given intravenous fluids and antibiotics and was placed on a respirator in the intensive care unit. By May 3, Glenn was stable enough to undergo surgery to repair his severed duodenum.
¶ 13. Glenn stayed in the hospital a little over one month, much of it in the intensive care unit. Dr. Sorey diagnosed Glenn as a victim of child physical abuse. Dr. Sorey testified that a severed duodenum occurs when the intestines are squeezed against *1076 the backbone in a pinching action. According to Dr. Sorey, a twenty-two month old child is unable to inflict this type of injury on himself. Further, even an accidental “swan dive” from the top of a cabinet could not have caused this type of injury. Dr. Sorey explained that a blow with enough force to sever the duodenum would have to be concentrated in a small surface area. He opined that Glenn’s injury was most likely caused by a blow from a fist or a foot and was most likely administered no less than four to six hours before he presented to the emergency room, but no longer than twenty-four hours. Dr. Sorey was surprised that Glenn did not die from this injury.
¶ 14. Dr. Sorey described other injuries that he observed, and photographs he took of the injuries were admitted into evidence. He was concerned with Glenn’s racoon eyes, a condition caused when trauma to the head hemorrhages under the skin into facial tissue and settles under the eyes. Dr. Sorey testified that a blow with a plastic bat would not have enough force to cause racoon eyes. A bee or wasp sting also could not cause racoon eyes. Dr. Sorey opined that the bruising on the tip and side of Glenn’s penis was a pinching-type injury. Dr. Sorey testified that this type of bruising commonly occurs when someone is trying to discipline a child for toilet accidents. A photograph taken on May 6 revealed a large bruise at the bottom of Glenn’s head near his neck. Dr. Sorey testified that the injury which caused the bruise could have occurred before Glenn’s trip to the hospital. He explained that one does not always immediately bruise after a blow and that given Glenn’s low blood pressure and the shock caused by the abdominal injury, Glenn probably did not have adequate blood pressure to bleed into the injured area. Dr. Sorey agreed that this injury could have been what Glenn was referring to when he complained about his neck.
¶ 15. Following involvement by the Mississippi Department of Human Services (MDHS), and questioning by Sheriff Dillon, Wheat stood accused of felonious child abuse, and Melanie stood accused of child neglect. Mercifully, MDHS obtained court-ordered custody of Glenn, and Melanie was allowed only supervised visitation. In his statement to Sheriff Dillon, Wheat explained Glenn’s racoon eyes as the product of either a bee sting or a self-inflicted blow from a plastic bat. He also told Sheriff Dillon that Glenn may have been hit,by a door on the trailer that had slammed shut. He explained the bruises to Glenn’s penis as an injury which could have occurred when Glenn fell from a three-foot brick wall surrounding the porch on - the trailer. Wheat explained that Glenn’s diaper was pulled down when he fell. Wheat denied administering the blow that severed Glenn’s duodenum and, unlike the other injuries, could not offer an explanation for how this injury occurred.
II. LAW AND ANALYSIS
WAS THE VERDICT OF THE JURY CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 16. To prove felonious child abuse, the State had to prove that Wheat intentionally whipped, struck, or otherwise abused or mutilated Glenn “in such a manner as to cause serious bodily harm.... ” Miss.Code Ann. § 97-5-39(2) (Rev.1994). There is no question that Glenn sustained serious bodily harm. There is also no question that the blow which caused the injury was intentional because the medical testimony clearly established that Glenn was not old enough to self-inflict his injuries and he could not have sustained his injuries accidentally., The only question is whether Wheat administered the blows that caused Glenn’s injuries.
¶ 17. Wheat argues that the verdict was against the overwhelming weight of the evidence because no one saw him abuse Glenn. He also argues that Melanie had the opportunity to administer the blow which almost killed Glenn. An argument *1077 that the verdict was against the overwhelming weight of the evidence is challenged in a motion for new trial. The decision to grant or deny such motion is discretionary with the trial court. McClain v. State, 625 So.2d 774, 781 (Miss.1993). The trial court should grant a new trial motion only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. Wetz v. State, 503 So.2d 803, 812 (Miss.1987). In reviewing the trial court’s denial of a new trial motion, we must accept as true all evidence favorable to the State, and we may not reverse absent an abuse of discretion. McClain, 625 So.2d at 781. “The jury is charged with the responsibility of weighing and considering the conflicting evidence and credibility of the witnesses and determining whose testimony should be believed.” Id.
¶ 18. Wheat’s testimony was severely impeached, even by his own mother, who admitted that her son was a liar and could “tell some tall tales.” During the course of trial, it was revealed that Wheat had uttered numerous lies to several people. For example, he told several witnesses that he had a twin brother who had died at age eighteen in the Gulf War. At trial, faced with his biological mother’s testimony that she had never given birth to twins, Wflieat admitted that he lied about having a twin brother. Wheat told several witnesses that he had flown helicopters in the military, and he told Melanie that he was in the Gulf War. At trial Wheat admitted that he had never been in the military and testified that if he told anyone that he was in the military it was to “exalt himself.” In perhaps the most bizarre portion of his testimony, Wheat claimed that he was an informant for the FBI in drug-related matters. According to Wheat, his contact with the FBI was named “Mike.” When ordered by the trial judge, Wheat revealed a six digit code which he was given if he needed to contact Mike by telephone; however, WTheat forgot the toll-free telephone number which he had to dial first before dialing the six-digit code. Wheat had never heard of the federal Drug Enforcement Agency and was surprised to learn that the FBI did not normally involve itself in drug-related matters. Wheat testified to one episode where he and Mike flew to a place in Louisiana called “Beirut” for a meeting designed to set someone up for drug-running.
¶ 19. While Wflieat was not observed administering any of Glenn’s injuries, most of the injuries occurred while Glenn was under his exclusive care. Wheat’s multiple explanations for the injury which caused Glenn’s racoon eyes were proved false by the medical testimony. Further, Wheat lied about being alone with Glenn when he sustained the fingerprint bruising on his face.
¶ 20. Wheat was alone "with Glenn during the time period within which the blow to Glenn’s stomach could have been administered. Melanie was also alone with Glenn for a portion of the relevant time period. Wheat’s elaborate attempt to establish that he and Glenn were with others during the time period between his picking Glenn up from Precious Angels and his picking Melanie up from work failed. It was proven that he lied about the time at which he picked Glenn up and the people he and Glenn presumably visited that day denied seeing them. Wheat’s compulsion to establish an alibi for the relevant time period leads one to believe he had a reason for needing to cover his tracks. While Melanie will not be receiving any awards for mother of the year anytime soon, no evidence connected her to any of the abuse.
¶ 21. Given Wheat’s penchant for telling tall tales and his uncanny ability to supply alternate, albeit false, explanations for Glenn’s injuries, the jury exercised its function as the arbiter of witness credibility by rejecting Wheat’s testimony. Taking the evidence in the State’s favor as true, the verdict was not against the overwhelming weight of the evidence and al *1078 lowing the verdict to stand does not sanction an unconscionable injustice to Wheat.
¶ 22. THE JUDGMENT OF THE LINCOLN COUNTY CIRCUIT COURT ON CHANGE OF VENUE FROM WALT-HALL COUNTY OF CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE OF $10,000 IS AFFIRMED. COSTS ARE ASSESSED TO WALT-HALL COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, PAYNE, AND THOMAS, JJ„ CONCUR.